(42 South. 793.)

No. 16,118.

WILLIAM T. HARDIE & CO. v. VICKSBURG, S. & P. RY. CO.

(Jan. 7, 1907.)

1. CARRIERS—ACTION ON BILL OF LADING—FAILURE TO DELIVER.

Suit was brought by plaintiff against defendant on a bill of lading negotiable in form.

2. SAME—NEGOTIABILITY.

Bills of lading are to be taken in the same manner, to the same extent, as bills of exchange and promissory notes. St. 1868, p. 194, No. 150, on the subject.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 9, Carriers, § 168.]

3. CUSTOM AND USAGE—BILLS OF LADING.

According to the uncontradicted testimony of plaintiffs under local custom of merchants, and as relates to that custom, the bill of lading was not functus officio on the day that it was transferred to them. The time that had elapsed from the date it was issued was not unreasonable.

4. CARRIERS—LIABILITY OF WAREHOUSEMAN.

The carrier, who deposits the goods carried in a warehouse for safe-keeping, in time incurs the liability of a warehouseman, and from that point of view the warehouseman's receipt is negotiable.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 9, Carriers, § 168; vol. 48, Warehousemen, §§ 31–34, 37.]

(Syllabus by the Court.)

Appeal from Sixth Judicial District Court, Parish of Ouachita; Luther Egbert Hall, Judge.

Action by William T. Hardie & Co. against the Vicksburg, Shreveport & Pacific Railway Company. Judgment for plaintiffs, and defendant appeals. Affirmed.

Stubbs, Russell & Theus, for appellant. T. M. & J. D. Miller and Andrew Augustus Gunby, for appellees.

BREAUX, C. J. Plaintiffs instituted this suit against the defendant for $3,637.76 on three bills of lading issued by defendant in negotiable form for 50 bales of cotton.

From a judgment rendered for plaintiffs for $2,250, allowed to them by the judgment, as well as some interest, the defendant appeals.

The bills of lading issued by the defendant company were, on the day that they were issued, deposited by Dr. F. A. Brown, to whom they were issued, with the Merchants' & Farmers' Bank of Monroe as collateral security to secure the account which he had with that bank. They remained on deposit with that bank about seven months. At the end of that time they were withdrawn from the bank by Brown and mailed by him to plaintiffs, as collateral securities to secure a draft drawn by him on them.

After receipt of these bills of lading and payment of said draft, plaintiffs notified defendant's agent at Vicksburg, Miss., to reship the cotton to them at once.

The officers of defendant, after having made some search, found that they could not deliver the cotton, for the reason that it had already been delivered to Lum & Co., of Vicksburg.

Plaintiffs had not previously received the least notification of the delivery of the cotton to the last-mentioned firm.

It will require but a moment to state how it happened that the cotton was erroneously delivered, and why it was that delivery was made of the cotton by the railroad company without requiring the surrender of the bills of lading.

F. A. Brown, during the season of 1902–03, shipped about 400 bales of cotton from Rayville, La., to the firm of Lum & Co., cotton merchants, at Vicksburg, Miss. It was all properly delivered to the firm, but in Novem-

ber, 1902, Brown chose to make a change—to have the bills of lading made differently from those which had previously been issued to him. He had them made to shipper's order. He thereby retained full control of his shipment.

After it had been carried over by defendant to the place of destination, it was delivered by it for storage and safe-keeping at the compress of the Vicksburg Cotton Press Association.

It does not appear whether the defendant road directed this warehouse to deliver the cotton to J. J. Lum & Co., or whether the warehouseman assumed that the shipments were intended for that firm, because of the fact that the other cotton of the consignor, Brown, had been delivered to it.

The defendant does not seem to dispute plaintiffs' averment that the warehouse was its agent, and that the error in delivering the cotton to Lum & Co., without previously requiring the bills of lading or without any authority from the shipper, who was its consignor, was its own error.

The pleadings and the testimony lead us to the conclusion that, defendant having undertaken to transport the cotton and deliver it to the consignee, in this instance it held itself bound until delivery had been made to the proper person.

The following is, in substance, that part of defendant's answer pertinent to the subject.

That it transported the cotton to its destination and delivered it for storage and safe-keeping at the compress and warehouse of the Vicksburg Cotton Press Association; that during the cotton season of 1902, prior to the shipments hereinbefore described, F. A. Brown, agent, had shipped his cotton, consigned to and in care of J. J. Lum & Co., a cotton commission and brokerage firm, and that the cotton press association, believing that the cotton in controversy herein was also intended for said firm, delivered 50 bales of cotton to J. J. Lum & Co. in error and without respondent's authority.

This delivery was made by the warehouse without requiring the presentation of the bills of lading or any authority from the shipper, who was his own consignee.

Lum & Co. sold the 50 bales at different dates from December, 1902, to March, 1903, for the account of the consignor, Brown, owner and holder of the bills of lading sued on, and the proceeds of the sale were paid to him; the last payment having been made in June, 1903.

In substance, the respondent avers, further, that at the date said bills of lading were delivered and negotiated to the plaintiff, as alleged in its petition, said bills of lading were without effect, having been satisfied by the sale of the cotton and the receipt of the proceeds thereof by the consignor; that their dates were notice against their negotiability.

It is a fact, as alleged, that the cotton was sold by Lum & Co., and the evidence shows that accounts of the sales were furnished by them to Brown. The members of the plaintiffs' firm testified, and their testimony is uncontradicted, that the bills of lading were with the Merchants' & Farmers' Bank, because both the shipper and the president of the bank had informed them of that fact before they came into their possession. The members of the firm speak of these bills of lading as having been pledged to the bank up to the date they were delivered to Brown and mailed by him to them. They state under oath that these bills of lading were acquired by them in the usual manner.

Plaintiffs have testified, and their testimony is not contradicted, that their claim is based on information received by them both as to weight and quality from the shipper; that according to the custom of merchants in this locality bills of lading are considered good and valid, although seven months have elapsed from the date that they are issued;

that the transaction is not at all unusual; that there was not the least occasion to make an investigation; that they never refused to accept a shipper's order and bill of lading, because it was six months old; that the period was not extraordinary; that the bill of lading was an obligation on the part of defendant to deliver the cotton upon their surrender of the bill of lading, properly indorsed, and that there was no statement in the bill of lading to lead them to think that it would not be as good six months after it had been issued as at any other time; that there was nothing unusual in their appearance; that they had been informed that it had been held in trust by the bank for some time, and they had no cause to suspect that the railroad had departed from its usual custom of requiring the bill of lading before the delivery of the cotton; that they took the bill of lading with the expectation of getting the cotton for use in their business, and that they were in a position which compelled them to pay the shipper's draft after they had consented to accept the bill of lading; that they could not have delayed payment of the draft and retained the bill of lading long enough to have the whereabouts of the cotton investigated, even if there had been reason for their making such investigation; that the surrender of the cotton without the bill of lading was a most unusual occurrence. These witnesses also added, in substance, that the railroad may sell property transported and warehoused by it after a year has elapsed for account "to whom it may concern."

The question is whether, under the statutes of the state, a bill of lading is negotiable in a restricted sense only, or whether in a broad sense.

In a number of jurisdictions, a bill of lading is taken in a restricted sense.

It must be said that, in the jurisdictions in which bills of lading are taken in the restricted sense only, there is no statutory regulation upon the subject, or at any rate no statutory regulations such as we have in Louisiana. They are not as strongly expressed in favor of the negotiability of a bill of lading.

Under the common law, a bill of lading is regarded strictly as a symbol of the goods. The pledgee of the bill of lading has no more title to the goods than if the goods themselves were delivered to him. Am. & Eng. Ency. of Law, vol. 18, p. 629.

Under the common law, prior to Acts 1868, p. 194, No. 150, it was, in substance, held that the bill of lading was not in all respects negotiable. Adams v. Trent, 19 La. Ann. 262.

The statute above referred to should govern.

Bills of lading, under the statute cited above, are to be taken in the same manner and to the same extent as bills of exchange and promissory notes now are.

There is no room left for the least difference between bills and notes and bills of lading. As to negotiability, one is to be taken as the equivalent of the other.

The full negotiability of bills of lading was recognized in the case of Delgado v. Wilbur, 25 La. Ann. 83.

It is true that subsequently a different opinion was expressed. Hunt v. R. R., 29 La. Ann. 448.

The court was not unanimous. Two of the justices dissented. Justice Spencer, in his minority opinion, said:

"The law of 1868 was enacted in the interest of commerce; it created one of the most important branches of our credit; it secures the most legitimate transaction; it sanctioned, legalized, and protected a fair, but imperfect, custom, which perished before its adoption; and it is by far more wise and more equitable than the vacillating and doubtful jurisprudence of other states."

That view impresses us. It is consonant with the letter and spirit of the statute in question, and forcibly commends itself as the

correct construction. It occurs to us that the view of the majority should not be followed, and that the decision should be considered among the overruled.

The Lallande Case, 42 La. Ann. 705, 7 South. 895, went, as we think, beyond the necessity of the case.

There was a law which affected the negotiability of the bill of lading by reason of the fact that the commission merchant had transferred to a bank a bill of lading of one of his own customers, who owed him nothing, as a security to cover a debt of his own, although he did not own the cotton shipped and did not have the least claim to it.

In that case the factor's only right was to sell the property and account to his principal, who did not owe the factor anything.

Act No. 66, p. 114, of 1874, which is a statutory pledge, provides the extent of the factor's interest and to which he may transfer a bill of lading, that does not give him unlimited control of his customer's or principal's bill of lading, though the customer or principal owes him nothing.

In the Missouri law (referred to in the Lallande Case in error as applying) it is stated that bills of lading shall be negotiable by written evidence thereon and by delivery in the same manner as bills of exchange and promissory notes. This has been construed to mean that they were transferable in the same manner as negotiable notes, but that they only transferred the property. They were only a symbol of the thing itself, nothing more.

In interpreting this statute, the Supreme Court of the United States held that the negotiability was, by the terms of the statute, restricted; that the bill did not have the full negotiability of the commercial law. Shaw Case, 101 U. S. 565, 25 L. Ed. 892.

But it does seem to us that the Louisiana statute has a larger scope:

"Negotiable to the same extent as bills of exchange and promissory notes."

The last-cited decision, relating to the Missouri statute, is not, in consequence, as persuasive as it would be if it related to the Louisiana statute.

The statute of Maryland, on the other hand, is in effect similar to the statute of Louisiana; and in that state the law was construed to mean that bills of lading are negotiable instruments in full without restriction. Tiedeman v. Knox, 53 Md. 612.

Prof. Denis, in his work on "Pledge," who has made a special study of the subject, informs us that the statute of Maryland has rendered bills of lading fully negotiable.

He says:

"It is the law of France and other continental countries of Europe. The reason of such a rule, where it exists, is the same as the reason of the negotiability of bills of exchange and promissory notes—to promote commerce by facilitating financial operations." Denis on Pledge, §§ 390, 391, 393, et seq.

Having reviewed the decisions and referred to comments upon the subject of negotiability, we return to the Lallande decision only to state that we do not differ from the decree in the Lallande Case, but we differ from the opinion.

Another ground: The defendant sets up that it had delivered the goods for storage and safe-keeping at the compress and warehouse at Vicksburg, and that the warehouse delivered the cotton to Lum & Co. in error and without its authority.

The question arises at this point whether, after having delivered the cotton to the warehouse, the defendant was relieved from all further responsibility.

We think not. The following are our reasons:

The defendant had bound itself to safely carry the cotton to its place of destination and reasonably to take care of it. It could not, by delivering the cotton to a warehouse, escape all further liability.

The liability does not cease on the arrival of the goods at their place of destination and their delivery to a warehouse. Columbus & W. Ry. Co. v. Ludden & Bates, 89 Ala. 612, 7 South. 471.

The liability becomes exclusively that of a warehouseman. Ayers v. Morris & E. R. Co., 29 N. J. Law, 393, 80 Am. Dec. 215; National Line S. S. Co. v. Smart, 107 Pa. 492.

The carrier retains the goods as depository, and not as carrier.

In one of the cases now before us, the goods were stowed by the carrier in a warehouse The owner, owing to a misunderstanding, was not timely in claiming them. Held, that the court properly refused to instruct the jury that plaintiff should have removed the goods before three months had elapsed. Wilson v. California Cent. R. Co., 94 Cal. 166, 29 Pac. 861, 17 L. R. A. 685.

The presumption is that, after the responsibility of the carrier ceases as carrier, it becomes a warehouseman. 6 Cyc. 460.

It devolves upon the carrier to prove why it was that the goods were not delivered. In the absence of proof, it will not be presumed that the warehouseman, and not the carrier, is liable.

The warehouseman has it in his power to sell the goods at the expiration of 12 months for "account of whom it may concern." It follows that the carrier first and the warehouseman afterwards cannot be annoyed after that time has elapsed, for they have it in their power to dispose of the goods.

A bill of lading, under the views before expressed, in time becomes equivalent to a warehouseman's receipt, which also is made negotiable as commercial paper. See Acts 1902, p. 329, No. 176.

For reasons assigned the judgment is affirmed.

LAND, J., concurs in the decree.